The appellate is David Abney. Mr. Abney? May it please the Court. My name is David Abney, and I'm here on behalf of Sandra Jauregui. Another name that may come up is Tony Giotsos, who's an expert, and his name is pronounced Uchess. I hope we don't have to... You can call him whatever you want. Yes, Your Honor. We call them plaintiff and the expert. You'll understand who we're talking about. Yes, Your Honor. I'd like to reserve a few minutes for rebuttal. This was the hardest argument I've ever had to prepare for. There's so many issues and sub-issues, I have no idea where to start. I welcome, of course, all the questions on earth that you want to... I would recommend this. Assume that the panel has read the briefs. As you know, many times lawyers like to read us what they've written, which is a waste of time. Tell us what you think we don't understand and how you can help us with that, and that will be of some use to us. Thank you, Your Honor. Well, I hope you understand everything. I would like to start off with the consumer expectation test, which we submit is the test that applies here. And in Arizona, the consumer expectation is an expectation of how safely the product could be made to perform. You don't actually have to know the specifics of the design at all. And the consumer expectations test still applies. Which of the defendants does your consumer expectations argument extend to? It extends to all of them, Your Honor. Okay, so let's, if I can get you to focus on Daimler, I think I'm pronouncing it correctly, the manufacturer of the truck. Oh, well... Does the argument really extend to them? Yes. So the consumer expectation that you think makes the product effective is that it should never stall? It should not stop in the middle of the highway for no apparent reason whatsoever? How do we know? Now I understand your argument. One of my difficulties is that you're supposed to show that a defect existed at the time of manufacture, at least for this defendant. And the truck had been driven for 121,000 miles. So how, even if a truck shouldn't stall, how do we know it was because of a defect in its manufacture, as opposed to its upkeep or any number of other things? It had been in somebody else's hands for almost three years. Well, the parties worked very hard from both perspectives to find out what went wrong. They went through the maintenance records. They inspected the vehicle intensively. They ran it for a long period of time. Could not find anything other than it just stopped that one day. So there is something wrong with that vehicle if it stops unexpectedly on a freeway for no apparent reason. But is there something wrong with its manufacture? I don't doubt that there was something wrong with the vehicle. You need to demonstrate, at least against the manufacturer, maybe not against others, that it was defective when it left his hands. Well, so many times you cannot prove that. And Arizona doesn't require that you prove that exactly at the moment it left your hands. Well, the cases where Arizona hasn't required it are ones where the product is brand new and it falls apart or the wheel comes off the car and there's no intermediate use and there's no intermediate ownership by other folks. Do you have a case close to this in which a court finds a triable issue of manufacturing defect when the alleged defect shows up three years later and nobody can specify what it is, where it is? Especially when it's over 127,000 miles?  I mean, that's a long travel history. It is a long travel history, but there's no other explanation for what happened other than But is no explanation enough to establish a product defect? In other words, nobody's actually established that there was a defect in the product when it left the factory either. You just can't find any explanation at all. So is the absence of an explanation for something that's been driven 121,000 miles enough to get you to a jury? Yes, it should be. If you eliminate every other possibility, what you're left with is there has to be some sort of a defect in design or manufacture. Otherwise, it would have worked. Everybody worked very hard to eliminate all other possible explanations for what went wrong with this vehicle and couldn't find anything. So you're left with it's a design defect or it's a manufacturing defect, especially since you can't seem to replicate it. We had experts who said, well, we can identify a probable cause and it's a malfunction in the computer system controlling the auto shift transmission or a failure to maintain because of a problem with the proprietary electronic controls for the transmission clutch. So the experts identified, two experts identified possible causes. That's all you need when you're talking about experts. But no expert opined that was the cause? No, they said that's the possible cause. You don't need to go beyond that. Let me change the facts. You're an experienced guy, so I don't need to explain to you. Those are not the facts in this case. If it had been 10 years and the truck stalled for the first time or stopped working in traffic, would you be entitled to go to the jury on the same evidence as this case? Yes, Your Honor. There's no other explanation that's out there for what happened. Something is wrong in its design, something is wrong in its manufacture, or maybe it's a combination of both things. But that's what you have. You have an otherwise inexplicable situation. And as the courts have said, you don't have to have certainty in your expert testimony. And plus, engineers follow what's called failure trees, just like Sherlock Holmes. When you eliminate the impossible, whatever remains, however improbable, must be the truth. So the truth that's remaining here is there's some sort of defect in design, some sort of defect in manufacturing. But you come around then to the real important thing, which is the consumer expectation test. Would a reasonable consumer expect that a tractor trailer would simply stop in the middle of the road for no discernible reason whatsoever? And a reasonable consumer would say, no way, this is ridiculous. Whatever this contraption was supposed to do, it didn't do it. They took care of that. Every possible other explanation was eliminated. They spent an enormous amount of time, effort, and money, and we spent an enormous amount of time, effort, and money trying to find other causes. It wasn't gas, it wasn't poor maintenance, it wasn't any sort of easily, it wasn't any sort of identifiable mechanical defect. None of those things applied. So you're left with, well, all that's left is a design defect. The failure tree is the answer from your perspective. The failure tree, the Sherlock Holmes failure tree, is the answer from your perspective. Yes, in a sense it is. It's a diagnosis by elimination. It's something that doctors do all the time, differential diagnoses. You say these are the possibilities, and like a house episode, we eliminate this one, we eliminate that one, and finally we get to one that no matter how odd it seems is the only explanation that's left. And that's a valid way to approach this kind of situation. But we come back to the essential question is what about the consumer expectation test? Because we're not talking about benefit analysis or all these other kinds of things. We're talking about would a reasonable consumer expect that a tractor trailer would simply stop in the middle of the road for no discernible reason, nothing about gas or maintenance or anything else. It just stops. That's enough to go to the jury in Arizona under the consumer expectation test. Counsel, Judge Gould, can I ask you a question, please? Yes, Your Honor. Yes, sir. In a design defect case, which party has the burden of proof? Oh, the plaintiff, Your Honor. But the consumer expectation test is incredibly consumer friendly. You take a product that you may not deal with regularly, and on pages 25 to 30 of the reply brief, I set down 33 different complicated products where the consumer expectation test has been applied, many of them products that no average consumer would ever use, and the consumer expectation test was applied in every single one of those cases. From California and Arizona. I've stressed Arizona, but we have some overlap with California law since we depend so heavily on California law and have depended for decades for the development of Arizona product liability law. Counsel, how do we know when the truck was driven for so long before it stalled? How do we know for certain that there couldn't be another cause other than that design defect? There might be, and when you think about the consumer expectation test, my view of it is this, that you start out by saying to reasonable consumers, could you, as a reasonable consumer, say that there is something wrong with this product? It did not meet the expectation of the average reasonable consumer. And the answer here is this wouldn't meet any average reasonable consumer's expectation. But do you have to identify a specific defect? No. But under that test, if you asked, would the average consumer think there's a design defect merely because a car stalled after more than x thousand miles of driving? I believe the average consumer would say there is something seriously wrong with this product, and it does not meet my expectation as a consumer as to what a tractor-trailer ought to do. Tractor-trailers ought to be dependable, they ought to be reliable, they're big, dangerous machines, and this one just simply stopped. There's no explanation for it that anybody's ever been able to discover other than possibles that are supplied by our experts. And experts can deal in possibilities. I mean, if you ever come across an expert, from your experience as judges, you come across an expert who's saying, I'm absolutely 100% right, this is the truth, the gospel truth, you'd be going, what's wrong with that expert? Experts don't testify that way, they don't think that way. Good experts don't talk that way, they don't come to conclusions like it's Moses coming down from the mountain with the tablets. Is it true that a definition of an expert is someone who knows more and more about less and less until they know everything about nothing at all? Yes, Your Honor. However, experts do serve a very important function. In this case, of course, under the Consumer Expectation Test, you don't rely on experts when you get right down to it. It's what you focus on, what the reasonable consumer thinks about these things. And as I showed in my, I think, are you ready to ask a question, Judge Horowitz? No. Well, I was going to ask a question, but I wanted you to let you finish first. Well, as I tried to show in those 33 examples of very complicated products, consumers have an expectation that they develop through common sense and experience in life that products just don't fail. And if they do, then it's your expectation as a consumer there's something wrong with it. Did any of your experts, and I'm just trying to look at the record while you were arguing, did any of them opine that the cause was a manufacturing defect or did they just exclude other possible causes? For the lead vehicle, the Freightliner, they couldn't tell precisely what it was. They excluded it. Right. I'm just asking for the vehicle. Let's put aside a second the ADAS system because I want to give you time to get to that. But for the vehicle, I was trying to look in the record, and I'm not sure I could find an expert who said, it is my opinion that there was a defect in the vehicle when it was manufactured. I think the best they could do is that I can't find any other explanation. Is that a fair summary of that? Yes and no. It's a sort of a fair summary. Sort of fair is the best I can do. If I ever get sort of fair, I'd be thrilled. But for expert Bosch, we're talking about the Freightliner, he said the most probable cause was this proprietary electronic control problem. And Philbrick said that the cause was a problem with the computer system controlling the auto shift. Did either of those people say, and it was that that defect existed at the time this left the factory? No, Your Honor. No, Your Honor. But then again, wouldn't it have to when you think about it in a common sense sort of view? I don't know. I'm just trying to establish a factual point. Yes. I want to give you time to get to, I take it that the arguments about the Bendex system don't extend to Daimler, right? Correct. They only extend to the other two defendants. Packar and Bendex.  And so, again, focusing simply on the consumer expectation test, is the consumer's expectation, is it relevant that the manual for the product says it won't work all the time? Sometimes it won't work and we've designed it that way because we don't want you to get too many false alarms. So how could a consumer expect that it would work all the time? You would expect that it would work unless there was some reason why it would not work. I mean, you would expect in general that it's going to work properly. And they didn't identify any reason why it would not have worked properly. But it plainly says you can't rely on the system entirely because we've designed it so that sometimes it won't work. And we've done that for a good reason. Because designing it another way would be giving you false alarms all the time. So you can argue about other defects, but I'm trying to figure out why a consumer's expectation under that circumstance would be that it would always work. Why would you not have that expectation? I mean, what they're saying is you need to be alert as a driver and you need to take action when you see a problem. Well, they said more. They said it's been designed so that it does, you know, that we want to eliminate false alerts. And so it's been designed so that one in every, I don't know whether the appropriate number is 5,000 or 10,000, but it really doesn't matter. There will be occasions under which this system will not protect you, the manual says. And so why should a consumer have the expectation that it will protect him all the time? Well, in this case, this is not a situation where a reasonable consumer would assume it would not protect. You have a big, stocked tractor trailer right in front. You would, as a reasonable consumer, you would expect, of course, it's sitting right in front of you. It's this big tractor trailer. Of course it's going to engage. Of course it's going to give you an alarm. Of course it's going to activate the automatic braking system. A reasonable consumer would say a product that doesn't do that, based upon what we see in the manual and based upon our reasonable expectations, is defective. It fails to pass any sort of reasonable consumer expectation. Can I suggest that you save some of your time? You've got three capable people on the other side who are going to disagree with you, and you may want to respond. May I suggest you save your time for now? I honor your suggestion, Your Honor. Very well. I believe Ms. Watercott, is that correct? You have seven minutes, is that right? Seven minutes is right. Very well. Let's hear from you. Good morning, Your Honors. My name is Patricia Watercott, and I'm here on behalf of Daimler Trucks. The district court got it right in this case when it entered judgment in favor of Daimler Trucks. There was simply no evidence in this case and only speculation. Keying this court into a specific quote from appellant's answering brief on page 29, Sandra cannot show that DTNA has caused a specific defect while the freight liner was under its control. So appellant has conceded in the opening brief, as to Daimler Trucks, that they cannot show that there was any specific defect that caused this accident that existed when it was under Daimler Trucks' control. And that is dispositive of this case. Well, Mr. Abney, and I'll rephrase his argument. He'll correct me later if I screwed it up. But he says, well, there was more here. We have a bunch of experts who nobody could figure out why the truck failed. A couple said it probably was because of X or probably because of Y. And having eliminated all the other causes, aren't we left with the reasonable conclusion that it must be something Daimler did wrong? No. What his experts did as to Daimler Truck, there is two, Filbrick and Bosch. And they're at our supplemental records at page 9 and page 5. And if you look at, first, the expert, Filbrick, he's the expert that said, I think it's some sort of a computer issue. But he doesn't say, I think there was something wrong with the computer when it left the factory. But he doesn't say that it was wrong when it left the factory. And he doesn't say, I'm a computer expert. He says, I'm no computer systems expert, but the defect must have arisen in the computer systems. And you know what else? He didn't look at the computer system in the Daimler truck. He did not look at the hardware or the software. He does not purport to be an expert in computer systems. And he didn't have a methodology. We're hearing this failure tree language for the first time that appellant says the experts used. But that's not in the report. Peter Filbrick doesn't say, I used any sort of methodology or I used a failure tree. He didn't use any sort of reliable methodology. He didn't use facts. He didn't look at the truck. He speculated that it could be a computer system defect when he's not a computer systems expert. And the same is true, they have two experts, that's one. The other one was Dr. Bosch at supplemental excerpts, page five. He's a mechanical engineer. And he said, again, I think it has something to do with the clutch system or the computer system. He doesn't purport to be an expert in that area. And he doesn't talk about, I used a failure tree methodology that's accepted for forensic engineers. He doesn't say any of that. Well, had either of them said, it's my opinion that there was a fault in the computer system, would have left the factory. And I think this is probably what caused the accident. Then wouldn't they be entitled to get to the jury? No, because that's total speculation. Because he didn't look at the truck. I understand your argument is that they did a sufficient foundation. But let's assume for a moment that an expert with foundation said, it was the computer system that caused the problem. And there's something wrong with the computer system that must have been wrong at the time it left the factory. That would get you to a jury, wouldn't it? No, that would be speculative, too. And I'm assuming everything that you just said for purposes of this argument. But that would still be speculation. Because, number one, he's not saying what's wrong with the computer system. But let's say that he found something wrong with the computer system that he could identify which did not happen here. It would be entirely speculation on his part to say that that existed for 121,000 miles. That points to another significant issue with these declarations, which is which they never explain why, if there was an issue with the computer system, why would that not have manifested itself for 121,000 miles? Why did that issue not manifest itself for the next 80,000 miles? How do they explain that? Design defects don't fix themselves. Manufacturing defects don't fix themselves. And these experts opine there's those issues. But they don't say how that that's possible. And that's why they still don't get to a jury, because that's still just based on entire speculation. Just like the other evidence that they have in this case, which is pure speculation. They have started off or they have ended this case the same way they began it, which is speculation that a truck slowed down and came to a stop on a freeway. And, therefore, there must be a defect. And that's what slimly got them by the pleading stage when we filed a motion to dismiss. And this district court said, what you've got here is an unsubstantiated theory. Now you're going to have the opportunity and discovery to substantiate it. They did not substantiate it. They relied on two experts who didn't look at the truck and who made opinions about a computer system in a truck that they didn't look at, that they don't have those expertise. Let me ask you one more question about this decision tree issue. I've read the expert testimony. And I'm not sure I read it as saying I've eliminated all other possible causes, but rather I don't think the following things were the cause. Is that a correct reading? That's a correct reading. Those experts have their mechanical engineering expertise or the truck safety expertise. They eliminated possibly issues in their area, although I don't understand how they could have done that without looking at the truck. But they're saying we're eliminating the areas in our expertise, so it must be in some other area like a computer system that we don't know anything about. Very well. Your time is up. My time is up. Thank you. And Dyler Trucks asks that you affirm the district court's ruling. Very well. Thank you. Ms. Garcia. Your Honor, the heart of the disagreement today can be summarized as follows. What test applies to plaintiff's design defect, which is really the only claim that has truly been developed in the summary judgment briefing and on appeal? If it's the consumer expectation test, who's the consumer? And what do we look to to determine what the consumer's expectation was? And then once we figure out that framework, we then have to look at the record and determine did plaintiff carry her burden of persuasion, her burden of proof at summary judgment? So, of course, the first instance, defendant's position is that the consumer expectation test does not apply to the design defect claim. We look to Arizona state law and not other jurisdictions such as California to determine what test applies. And both defendants and the district court looked at the Arizona Court of Appeals memorandum decision in Maywald to determine that the consumer expectation test doesn't apply here. Maywald has some differences, but is still- So let me posit a different case for you. Yes. You go buy a new car and the wheels all fall off. Isn't it enough that the consumer expected that the wheels wouldn't fall off to establish that there must be a defect in the car? No, Your Honor. I also think that that example misses kind of a nuance that's in play here. What's the product? In your example, the product is the vehicle or arguably the tires and the wheels and how they're attached. Right. I understand in your case it's a different product. But I'm pushing back on your assumption that the consumer expectations test can never apply in a product's defect case. And let's assume that's all the consumer has and the wheels fell off. And when I bought the car, I certainly expected that they shouldn't. Does he need to prove more?  But I think, again, we're talking about a different product and the product matters. That's why I'm not sure why you think you need to convince us that consumer expectation test never applies to a product defect case. That's not our position. I think your more fertile ground is that it doesn't apply here, isn't it? That is our position, Your Honor, to clarify. That is our position. It doesn't apply when we're talking about emerging technologies such as the collision mitigation system, the wingman fusion system. That was in play in this case. And Maywald addressed kind of – it didn't address kind of these physical components to a vehicle such as tires or seat belts. It addressed this lane departure warning technology. And that's why it is the analogous case that should inform which test applies to similar, you know, collision mitigation systems in this case. I want to – because really, the remaining two defendants, the claims against them deal with the ADAS, right? Arguably, there is some ambiguity in the briefing. But as S the ADAS, I take it part of the argument is that it was designed in a way that it wouldn't work 100 percent of the time. That is not – That's their argument and some of your defense. And that's what the manual says. It's not going to work all the time. And that, Your Honor, is also explained by the manual, which makes abundantly clear that there are radar and camera technologies incorporated into this ADAS system that have inherent limitations. And those are neutral limitations. Distance, speed, there are all sorts of factors that impact whether those technologies are even able to detect an object in the first instance. Plaintiff's position is not that those technologies themselves are inherently defective. It's that the way Bendix's system, its algorithm specifically, that is what their expert, Mr. Utes, focused on, improperly balanced the data coming in from the radar and camera technologies. But we have a foundational threshold issue that hasn't been met. Did those technologies even detect this truck in the first instance? And there's no evidence that it did. Essentially, Mr. Jitsas and plaintiff rely on what amounts to nothing more than a RESS-IPSA theory of liability, which is something went wrong, so it must have been. Well, what if they didn't detect it? Yes. Isn't that a defect in the product? So I understand the argument that they may have detected it, but we've designed it not to alert you all the time, so you shouldn't expect that. But if you designed a product that didn't detect a parked truck in the middle of the freeway, isn't that a defect in the product? No, and again, I think we're misplacing the focus on what the product is. Bendix did not design the radar technology or the camera technology incorporated into its system, nor is this case about the sufficiency or adequacy of those independent technologies. It is about how Bendix's system weighed data inputs and balanced the risk of false alerts and the documented, substantiated risk of harm caused by false alerts with input data that says, well, there's a stationary object or stationary vehicle in the road. Well, but you've sold – Bendix designed the whole product, did it not? What's at issue in plaintiff's claim, which must frame? I mean, you're not really saying we're not responsible for the cameras and the radar, are you? We're saying plaintiff hasn't carried their burden of proving any defect in the camera and radar technologies. No, I understand that argument, but I'm asking a different question. You're responsible if there's a defect in the product, correct? And the product is this ADAS system, is it not? I think that loses the focus and misplaces the burden on us to preempt – I'm not asking who has the burden. I'm asking that – I'm asking a question of law. It's not enough for you to say, well, we didn't manufacture the camera or the radar system. You sold the product, which had the radar system and the camera in it, did you not? We did. And therefore, whether they proved your responsibility or not is a separate issue, but for better or worse, you're responsible for the whole product, not just the components of it. In the sense that – In every sense. Well, I'm not sure that I agree with your honest position. But again, we are responsible for the algorithm that we created and how it balanced the data inputs. The other software in play, plaintiff bore the burden of proving that we somehow imported or incorporated defective products into the Bendix system and didn't do that. And so they can't now on appeal try and shift gears and say, well, we have no evidence whatsoever that your algorithm is defective. We don't know what it did. Our expert never looked at it. We didn't conduct any written discovery in this case. And say, well, then we must assume the defect occurred and existed with your algorithm. So your time is up, unless my colleague has a burning question. Thank you. We're going to move on then to Mr. Lincoln. Good afternoon, Your Honors. Derek Lincoln on behalf of PACCAR, the manufacturer of the Peterbilt truck. While we've had a pretty good discussion about Arizona law, I'd submit that this case is really controlled by the federal rules of civil procedure and evidence. Summary judgment, which is the posture that we arrive on, is about evidence, not argument. And if you look, if you step through plaintiff's brief, every time we hear about the consumer expectations and what the consumer would expect, they are citation-less assertions of what a consumer would expect. We heard today that the consumer would expect that this would work all the time. Well, of course that's not the case, because the manual, which is their sole piece of evidence on which they rely, says it's not going to work all the time. And I think it's important to note that we're not writing on a blank slate here. One, the ordinary consumer is not you and me. It's the ordinary, professionally licensed CDL truck driver, the person who would be using this product. In Arizona, consumer expectations are developed through use of the product. That's Galonka, as well as Boyd v. ITT Grinnell. We have no evidence as to what actual consumers of this product would understand it to operate as. And I think what's a really instructive case, and perhaps I think this is so because I argued it, is the Youngberg case out of the 10th Circuit. The district court in the Youngberg case, that was a lack of automatic emergency braking case in a 15-passenger van for General Motors. The Youngberg court noted that for well over a century, the responsibility for braking and steering in the event of something in front of you has been well understood to be the driver's responsibility. So I would submit that if plaintiffs wanted to come forward with a consumer expectation argument, we would need to show that the paradigm has so shifted that you would expect a truck to do the braking or steering or warning for you, and we have nothing like that on this record. Let me ask the question I asked your friend. Are the claims against your client any different than the claims against Bendix? So I think the claims are exactly the same. My friend and I might quibble on what the product is. Obviously, we didn't manufacture an ADS. Yeah, but the only defect in your truck that's alleged appears to be the ADAS system. That's the only one alleged. I think the definition of the product is different. We would say the product that we manufactured is a truck. And so the question would be, is our truck that had a steering wheel, brakes, all the stuff that you would expect for a reasonably safe product, was that unreasonably dangerous because it also included this technology, new and emerging, that didn't work perfectly in this crash? The reason I wanted to draw back to Youngberg, the 10 circuits decision, is to compare the evidence that was submitted there to the lack of evidence that we had here. So in Youngberg, we had evidence of the prevalence of the technology. We had expert testimony that was deemed admissible. We had advertisements about this. Nobody has said that anybody has seen the Bendix manual at all relevant in this case. We had employee testimony from General Motors employees about the value of ADAS system. So the reality is, for whatever reason, and the district court called this inexplicable disinterest in the design of this truck, we just don't have any of that evidence on this record. And so once Mr. Uchis was properly excluded as an expert by Judge Tucci, the plaintiffs were just left with nothing other than this something is wrong mentality, and that is simply not Arizona law. I mean, I think the seminal case at this point is DART, and DART says the law does not impose liability for every injury caused by a product. Liability, quote, exists only if the product was in a defective condition unreasonably dangerous. That's plaintiff's burden to prove, and they just didn't do it. Well, they did establish that you designed a system that would fail at least on some occasions. I mean, that's what your manual says. We designed a system that can in certain circumstances alert. Not alert. Alert and break, and in other circumstances not, and this was one of the specific cases. Okay, so why isn't that a defective product if a product, and I'm not sure there was evidence introduced on this, but let's assume there was evidence that it was possible to design a product that worked 100% of the time. Would that establish the existence of a defect? So I think on the consumer expectations test, no, because we don't know what consumers would expect out of this product, but with respect to the facts on this record, this was specifically called out as a particular challenging scenario for these systems, which that is a high closing speed into a stopped object, and I think the other guidance that we ought to draw on this is the Maywald case that my friend alluded to, where the Arizona Court of Appeals said, consumers just don't have any expectations that this technology would be included at all, and as Judge Tucci I think well-reasoned, if consumers don't have any expectation that such technologies, ADAS technologies would be included at all, they certainly don't have the coherent expectations, this is the district court's language, about the nuances of the technology's design as opposed to the much coarser explanation of whether to include it at all, and so that's what we're left with, Your Honors, is a lack of evidence presented by plaintiffs on a new and emerging technology, and the only thing that we have to go on is something is wrong, and therefore it must be the manufacturer's responsibility, we know that's not the law from Dart, we know that's not the law from Raschke, and unless Your Honors have other questions, we respectfully request that you affirm this judgment. Counselor. Yes, Your Honor. Judge Gould, I have a question. Did the record establish on undisputed facts that the driver of the truck that crashed into the truck stall, that the driver was being attentive or being inattentive? To answer your question, no. The record did not show on undisputed facts that the driver was attentive. In fact, there was a disagreement amongst the experts as to whether he was attentive or not. I hope I've answered your question. And just to bring it to fore, I think the necessity of an alert and attentive driver is throughout these systems. These systems do not work without an alert and attentive driver. That's who they are designed for. They're designed as an aid for those alert and attentive drivers. I see that I'm over time.  Thank you. Thank you, Your Honors. Mr. Abney, you get to wind up this fine case in 3 minutes and 22 seconds. Yes, Your Honor. I just hope I'm not Captain Smith in the Titanic. You never know. Briefly, on the Maywald case, I don't think it applies. Paragraphs 9 and 10 are the important part of that decision. And there's a statement there that the consumer expectation test only applies when the ordinary consumer, through use of a product, has developed an expectation. And that's just not right. There's scores of cases in Arizona where the jury is allowed to apply the consumer expectation test when there's products that ordinary consumers don't ever use. What about, as to Daimler, who's the consumer? Well, I'm not very concerned about that. What you're really saying is somebody driving along the road has the expectation that the truck that he eventually collides with wouldn't have stalled. But it strikes me that, in this case, the decedent is not the consumer, is he? Does he really have an expectation about products that other people bought? The decedent would be one of the consumers. I think, in a broader sense, anybody that's using the motorway would be considered to be in the category. We have to be a consumer of the product to have a consumer expectation, don't you? Well, the problem is that, and people often overlook this, but I cited the Campbell case. The consumer expectation test focuses on and considers the expectations of a hypothetical reasonable consumer rather than those of a particular consumer. No, no, I understand that argument. My question is, is the decedent a consumer at all with respect to the Daimler truck? I understand why he's a consumer. Oh, the Daimler truck? No, I don't think so. He's not? No. So why does the consumer expectations test apply when we're talking about the Daimler truck? We're talking about a hypothetical consumer, which is the jury. The jury says, we've got this truck stopped. Hypothetical consumer, even under that circumstance, so it has to be somebody who's using the product or who's consuming the product, right? Well, it would be the driver of that truck or the category of people who drive that truck. Right, so your claim is not being made on behalf of the driver of the Daimler truck, but the driver of another truck. Right. So, again, tell me why he's the consumer. Well, he's a consumer in the first instance because he's using it, but more important, I think we're asking the wrong question. The question is, could the reasonable jurors conclude that this product was unsafe when used in a normal manner? No, I understand that argument, but I don't understand why the consumer expectations test applies to somebody who's injured because a product bought by somebody else fails. Because the product is in use and fails, and then you go to the jury and say, okay, what's your understanding here? What is your decision as the conscience of the community? Is this a product that has failed in such a way that it defeats the expectations of the reasonable consumer? And it does. Trucks don't just stop for no reason. And if I may mention, I might go over time, but. Be careful. Okay, I know. The Challenger disaster, for instance, it was O-rings that failed. But they had launched these stupid shuttles time after time after time, and nobody ever thought there would be a problem with the O-rings. And then finally, by process elimination, when the darn thing exploded, they figured it out. We'll eliminate this, we'll eliminate that, we'll eliminate all these other things, and all that's left has got to be the O-rings, and that turned out to be the culprit. So here we've got, for both of these vehicles, we've eliminated so many of these causes, and now we know that it would fit within the consumer expectations test that a reasonable explanation is defect in design or manufacture, and, of course, under the consumer expectation test, you don't even need to worry about experts. Very well. I think we have your argument. Do either of my colleagues have additional questions? Failing that, we thank all counsel for your argument in this case. The case just argued is submitted, and the Court stands adjourned for the day. Thank you, Your Honor. Thank you. All rise. This Court, for this session, stands adjourned.
judges: GOULD, SMITH, HURWITZ